## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **SCOTT BRIDGE COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 2:11-cv-1116-WKW-PWG** |
| | ) | |
| **GRESHAM SMITH AND PARTNERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the court on the following *Daubert*[1] motions: a motion to strike, exclude or limit the testimony of Dr. Richard Hartman filed by Defendant Gresham Smith and Partners (hereinafter "Defendant") (Doc. 65), Defendant's motion to strike, exclude or limit the testimony of Dane Floyd (Doc. 66), a motion to strike or exclude the testimony of Ben D. Nolan, III, filed by Plaintiff Scott Bridge Company, Inc. (hereinafter "Plaintiff") (Doc. 70), and Plaintiff's motion to strike or exclude the testimony of Dr. Ted Thomson (Doc. 71). The motions have been briefed by the parties and are ripe for consideration. They are taken under submission on the

---

[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See also* Fed. R. Evid. 702.

record and without a hearing.[2]

## I.    INTRODUCTION AND BACKGROUND[3]

Plaintiff filed this action in tort against Defendant alleging professional negligence, gross negligence, and/or wantonness. Plaintiff's claims relate to designs that Defendant prepared for use by Plaintiff in constructing "deep water" piers 7, 8, and 9 of the B.B. Comer Bridge in the Tennessee River.

Defendant describes the relationship between it and the Plaintiff and the B.B. Comer Bridge in its brief in support of its motion for summary judgment, which it incorporated by reference into its *Daubert* motions, as follows:

> "In March of 2001, Defendant ... contracted with the Alabama Department of Transportation (ALDOT) to serve as the design engineer for the B. B. Comer Bridge Replacement Project ... which involved the replacement of the B. B. Comer Bridge on State Route 35 crossing the Tennessee river in Scottsboro, Alabama. The bridge project was divided into three phases. Phase II included the section of the bridge crossing the main channel of the Tennessee River and involved Piers 7, 8 and 9 of the bridge. ALDOT contracted separately with Plaintiff ... as the contractor for Phase II of the bridge project."

---

[2] Upon review of the record, a *Daubert* hearing is unnecessary to resolve the motions at bar.

[3] The following is offered to supply context. Nothing herein should be construed as an express or implied finding of fact, and the parties should not attempt to extract clues as to the court's deliberations on matters associated with the pending motion for summary judgment or, if necessary, the trial.

(Doc. 68 at pp. 1-2). Plaintiff asserts that while preparing its cofferdam[4] design for the construction of the piers, its engineers noticed a potentially inadequate concrete seal designed by Defendant and notified ALDOT of the problem in early October 2009. (Doc. 87 at pp. 1-2).

Plaintiff further describes the dispute that arose between it and Defendant as follows:

> "ALDOT directed [Defendant] to evaluate its defective design and then develop a re-design to solve the problem. In its first evaluation, [Defendant] concluded its original design was "not good' and so informed the ALDOT. Several weeks of re-designs and uncertainty over the ultimate solution ensued until Scott Bridge was finally able to implement the re-designed work at the end of November 2009."

(Doc. 87 at pp.1-2). ALDOT is not a party to these proceedings. Separate and apart from this case, ALDOT and Plaintiff reached an agreement whereby ALDOT paid

---

[4]According to Plaintiff:

> "Cofferdams are temporary structures that are built around the drilled shafts for bridge foundations to allow people and equipment to safely work below ground or water level to construct a permanent structure. The water inside the cofferdam is pumped out so the bridge pier footing and columns can be built in dry conditions. In order to safely pump the water out of the cofferdam, a concrete seal is poured inside the bottom of the cofferdam and serves to resist buoyancy of the structure when the water is pumped out. The seal concrete must be of sufficient mass and depth to offset the buoyant forces created by the pumping and removal of water from inside the cofferdam and the upward pressures created by water outside the cofferdams. If the seal concrete thickness is not of sufficient mass or depth, pumping out the water will result in flotation and catastrophic collapse of the cofferdam."

(Doc. 95 at p. 1, fn. 1.)

Plaintiff a sum of money to compensate Plaintiff for losses associated with the re-designs on the B.B. Comer Bridge project.  Plaintiff alleges that Defendant's re-designs "caused considerable construction damages and costs to Plaintiff, the balance of which Plaintiff now seeks recovery in this action."  (Doc. 70 at p. 2).

In support of its allegations, claims, and petition for damages, Plaintiff relies on the testimony of two proffered expert witnesses: Dr. Richard Hartman, P.E., and Dane Floyd, C.P.A.  Defendant relies on the proffered expert testimony of Ben Nolan, III, P.E., and Dr. Ted Thomson, P.E.  Each proffered expert is the subject of a *Daubert* motion.

## II.   LEGAL PRINCIPLES AND DISCUSSION

Recently, this court set out the standard of review for motions to exclude expert testimony as follows:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court emphasized that Rule 702 assigns the trial court a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589 & 597, 113 S.Ct. 2786; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786)). This gatekeeping responsibility is the same when the trial court is considering the admissibility of testimony based upon "'technical' and 'other specialized knowledge.'" *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167 (quoting Fed. R. Evid. 702).

In light of *Daubert's* "gatekeeping requirement," the Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

Trial courts must consider whether: "(1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

5

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999)). These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs. *See id.* "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion," *id.*, and the proponent must meet its burden by a preponderance of the evidence. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (In addition, we note that "[t]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." (citing *Daubert*, 509 U.S. at 592, n. 10, 113 S.Ct. 2786)).

As to qualifications, "experts may be qualified in various ways," including by scientific training, education, and experience. *Frazier*, 387 F.3d at 1260. When evaluating the reliability of scientific expert testimony, the [district court] must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786. Factors that may bear on the reliability of expert testimony include (1) whether the expert's theory can be and has been tested, (2) whether the theory has been subjected to peer review and publication, (3) whether the known or potential rate of error of the methodology is acceptable, and (4) whether the theory is generally accepted in the proper scientific community. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786). These factors are not definitive, however. Other potentially relevant factors, depending upon the facts, include "whether the proposed expert ruled out other alternative explanations" and "whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (collecting cases). In short, trial courts retain "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. At the same time, trial courts must remain mindful that "*Daubert* does not

require certainty; it requires only reliability." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198 n. 10 (11th Cir. 2010). The focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

Finally, whether the expert testimony will assist the trier of fact in understanding the evidence or a fact in issue "goes primarily to relevance." *Id.* at 591, 113 S.Ct. 2786. "Expert testimony which does not relate to any issue in the case is not relevant and, *ergo*, non-helpful." *Id.* (citation and internal quotation marks omitted). "The 'basic standard of relevance ... is a liberal one,' but if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp.*, 582 F.3d at 1232 (quoting Daubert, 509 U.S. at 591-92, 113 S.Ct. 2786). Hence, under this third inquiry, "even if an expert's testimony [is] admissible under the first two prongs of the *Daubert* analysis, it may still be insufficient to create an issue of fact to overcome summary judgment." *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F.Supp.2d 1201, 1232 (N.D. Ala. 2011); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (District courts may reject expert testimony that is based on sound methodology when "there is simply too great an analytical gap between the data and the opinion proffered.").

*Seamon v. Remington Arms Co., LLC*, 51 F. Supp. 3d 1198, 1201-03 (M.D. Ala. 2014) (Watkins, J.). The rulings on the motions at bar is informed by those principles and the authority relied upon in *Seamon*.

Upon consideration of the motions, extensive briefs, and the evidentiary submissions, and "consistent with the 'liberal thrust of the Federal Rules [of Evidence] and their general approach of relaxing the traditional barriers to opinion testimony[,]'" the court concludes that the concerns each party raises with regard to

7

the other's proffered expert testimony go to the weight of the testimony, not to its admissibility. *See United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Daubert*, 509 U.S. at 588, 113 S.Ct. at 2794). "Questions about the weight given to testimony, as distinguished from the issue of its admissibility, are for the factfinder." *Brown*, 415 F.3d at 1270 (citing *United States v. Hernandez*, 141 F.3d 1042, 1052 (11th Cir. 1998)). That is especially true considering that there has been no jury demand by either party in this case, and the trial judge will be the ultimate trier of fact. *See id.* at 1268-69 (the rules regarding the admissibility of expert testimony "are even more relaxed in a bench trial situation, where the judge is serving as factfinder.").[5] "There is less need for the gatekeeper to keep the gate when the

---

[5] As explained by another district court within Alabama:

"While [the *Daubert*] concerns are of lesser import in a bench trial, where no screening [for] the factfinder can take place, the Daubert standards of relevance and reliability for scientific evidence must nevertheless be met." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002). Federal district courts are still "required to rely only on admissible and reliable expert testimony, even while conducting a bench trial." *Gonzales v. National Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J., dissenting) (listing cases). However, "district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements" of Rule 702. *Gonzales*, 225 F.3d at 635. Alternatively, in a bench trial, it has been an acceptable method "to admit evidence of borderline admissibility and give it the (slight) weight to which it is entitled." *See SmithKline Beecham Corp. v. Apotex Corp.*, 247 F.Supp.2d 1011, 1042 (N.D. Ill. 2003).

*United States v. Brown*, 279 F.Supp.2d 1238, 1243-44 (S.D. Ala. 2003) *aff'd*, 415 F.3d 1257 (11th Cir. 2005). The "weight" to be given to the experts' testimony will be determined by the

gatekeeper is keeping the gate for himself." *Id.* at 1269.

### A.    Dane Floyd, C.P.A.

Mr. Floyd, a certified public accountant, was retained by Plaintiff to provide expert testimony regarding damages suffered by Plaintiff in connection with the bridge construction project for which Defendant performed design work. Mr. Floyd reached the conclusion that, because of extra work performed and delays encountered as a result of the alleged design issue, the money ALDOT paid to Plaintiff was inadequate to compensate it for additional costs and reasonable profits related to the work on the B.B. Comer Bridge. Mr. Floyd also concluded that the unreimbursed damages incurred by Plaintiff total approximately $2.5 million.[6]

Defendant does not contest Mr. Floyd's qualifications, but argues that the methodology he used is unreliable because he did not conduct an independent analysis of the data Plaintiff provided to him in order to verify its accuracy. Defendant specifically argues that Mr. Floyd: (1) only verified eleven of thousands of entries on a job cost report; (2) did not independently verify the data he used in his calculations; (3) took no steps to verify the accuracy of Plaintiff's reported equipment usage on the project; (4) used the amount Plaintiff claimed for labor in the job cost

_____

trial judge.

[6] In addition to compensatory damages, Plaintiff demands $7.5 million in punitive damages. (Doc. 43 at p. 3).

report without independent verification of the same; (5) did not look beyond the job cost report to determine if Plaintiff had properly characterized the work being claimed; (6) and simply relied on conversations with Plaintiff in formulating his opinion that the profit was reasonable.

Defendant's challenges to Mr. Floyd's methodology are rejected. Defendant concedes that Mr. Floyd testified that he did not conduct the "independent analysis" because the data "had been subject to an audit process and reconciled with [Plaintiff's] financial statements." (Doc. 66 at p. 5 (citing Floyd Depo. at p. 119). Defendant does not indicate that the data Floyd relied upon was flawed, nor does Defendant explain why Floyd's failure to conduct an "independent analysis" causes his methodology to be inherently unreliable. There is sufficient evidence of record, particularly through Floyd's deposition and his curriculum vitae, to satisfy the court that Floyd is qualified to employ accounting methods that are standard in the profession and that his testimony is reliable such that it is admissible.

On consideration of the record, the court finds that Mr. Floyd, who is an accountant offering testimony in the area of accounting, is qualified to testify to the matters for which he is offered as an expert witness. Moreover, his testimony is relevant to the damages sought by Plaintiff and is likely to assist the trier of fact. Accordingly, the motion to exclude Floyd's testimony is due to be denied.

### B.   Richard Hartman, Ph.D., P.E. and Ted Thomson, P.E., Ph.D.

### 1.   Dr. Hartman

Plaintiff retained Dr. Hartman, "an engineer, to offer various opinions regarding [Defendant's] designs of Piers 7, 8, and 9, along with opinions regarding Plaintiff's construction practices." (Doc. 65 and p. 2). Dr. Hartman "graduated with a degree in Civil Engineering in 1965 and a Master of Science degree in 1966 with a focus on structural engineering. He obtained a doctorate in 1972, with a focus on structural engineering and minors in material science (metallurgy) and elasticity." (Doc. 87 at p. 6). He has been in the construction industry for over forty years, and he is a licensed professional engineer in 38 states. (*Id*.). He has experience with cofferdams, bridges, foundations, and foundations and designed cofferdams for a deepwater bridge in Georgia. (Doc. 87 at pp. 6-7).

Dr. Hartman reached the following conclusions in his expert report:

1. The means and methods used by [Plaintiff] to install the drilled shafts and the cofferdam were consistent with accepted construction practices.

2. The foundation designs for Piers 7, 8, and 9 as shown in the original Contract Drawings were unstable relative to uplift.

3. All foundation redesigns for Piers 7, 8 and 9 were stable relative to uplift.

4.      The first redesign of the Pier 7 foundation was not feasible to construct.

5.      [Defendant] did not meet [the] generally accepted standard of care and was negligent when preparing the original designs of Piers 7, 8 and 9.

(Doc. 69-1 at p. 9).

Defendant challenges both Dr. Hartman's qualifications to offer testimony in this case as well as his methodology.  Defendant argues that Dr. Hartman is unqualified on the following bases: (1) Dr. Hartman is not a geo-technical or structural engineer; (2) while he is qualified to testify regarding cofferdam design and construction, his expertise in cofferdams and retaining walls does not qualify him to testify regarding the standard of care for the design of a marine bridge foundation involving concrete; (3) Dr. Hartman has no experience designing a marine bridge with a concrete foundation and cannot testify as to the standard of care for designing the same; (4) Dr. Hartman has never testified in a case regarding the standard of care engineers should use in designing a bridge; (5) Dr. Hartman has never been involved in the construction or oversight of a bridge with drilled shafts like the subject bridge; and (6) Dr. Hartman did not conduct any specific research regarding the proper methodology for drilled shaft installation before formulating his opinions in this case.

Defendant also argues that Dr. Hartman's methodology is unreliable.

Defendant first argues that Dr. Hartman's understanding of methodology is derived from his discussions with contractors and past review of reference materials as opposed to specific research regarding the proper methodology for drilled shaft installation. This argument is not supported by testimony and other evidence of record as to the source of Dr. Hartman's methodology.

Defendant further argues that Dr. Hartman failed to use sufficiently reliable methodology in evaluating whether the foundation designs met the standard of care because the value he used in his calculations regarding resisting forces was unreliable for the following reasons: (1) the value of the friction force between the steel and surrounding soil was pulled "off the shelf" from a Minnesota Department of Transportation manual and was neither site- nor region-specific; (2) Dr. Hartman failed to consider friction between the drilled shaft and the rock socket because the Minnesota manual did not assume friction in that area; (3) Dr. Hartman used a value for the friction between the seal concrete and the steel casing/cofferdam steel that was more conservative than the standard of care; and (4) Dr. Hartman did not use an accurate value for the weight of the cofferdam steel because he ignored a resistive force that would have increased the total weight. In support of those arguments, Defendant refers the court to the methods and conclusions of its proffered experts.

Defendant also argues that Dr. Hartman used unreliable methodology in

evaluating whether the first redesign for Pier 7 was constructable because he offers only his opinion that the revised design was impossible to construct.

Finally, Defendant argues that Dr. Hartman's opinions regarding whether the foundation designs met the standard of care and whether the first redesign of Pier 7 was constructable are irrelevant and will not assist the trier of fact because the uplift calculations he used were not sufficiently related to the site-specific conditions in this case.

### 2. Dr. Thomson

Defendant retained Dr. Thomson, a licensed professional engineer, to "analyze whether Defendant's designs for Piers 7, 8, and 9 sufficiently resisted the buoyancy force that would have been created when the cofferdams were dewatered, and to render and opinion regarding whether or not GSP's foundation designs ultimately met the standard of care." (Doc. 85 at p. 2). Dr. Thomson "obtained a Bachelor's degree in Civil Engineering from the University of Delaware in 1993." (Doc. 85 at p. 4). He "subsequently obtained his Master of Civil Engineering degree (concentrating in structural engineering) from the University of Delaware followed by a Ph.D. (concentrating in geotechnical engineering) from the University of Massachusetts in 1998." (*Id*.). He is a licensed professional engineer in six states. (*Id*.). Dr. Thomson is a member of several professional organizations and "specialized in geotechnical

14

and structural design and instrumentation, and insitu geotechnical testing." (*Id.*).  He

has "worked on several projects in the past involving drilled shaft foundations for a

bridge," and "performed analysis of the drilled shaft foundations for a marine bridge

that was being designed for the Pennsylvania [Department of Transportation]" that

involved "drilled shafts, seal concrete and cofferdams." (Doc. 85 at pp. 7).  He has

also worked on projects involving cofferdams in water, and was engineer of record

on a marine project in Wilmington, Delaware that involved "a jetty with a cellular

cofferdam that 'behaves a similar way (to the case at bar) when it[']s subjected to the

forces." (Doc. 85 at p. 7).

Plaintiff contests the sufficiency of Dr. Thomson's qualifications to testify as

to the same.  Specifically, Plaintiff argues that: (1) Dr. Thompson's experience is

primarily in geo-technical projects, construction, and observation testing projects and

that his reliance on a staff engineer to perform critical calculations is evidence of his

lack of experience and expertise; and (2) Dr. Thomson has no experience in

performing engineering analysis involving a marine bridge with drilled shafts, seal

concrete, and cofferdams.

### 3.      Dr. Hartman and Dr. Thomson are qualified

Based upon Dr. Hartman's and Dr. Thomson's respective qualifications

described *supra*, each is qualified to so testify. A review of their curriculum vitae

reveals that Dr. Hartman and Dr. Thomson possess the necessary "knowledge, skill, experience, training, or education" to testify in this matter.  Fed. R. Evid. 702.  The arguments made against their qualifications are properly characterized as being related to the weight and credibility of their testimony, but do not belie their qualifications to testify on the subjects the parties identified in their Fed. R. Civ. P. 26 disclosures.

### 4.   Dr. Hartman's and Dr. Thomson's testimony is reliable and relevant.

Defendant's challenges to Dr. Hartman's methodology, as articulated in the briefing, are predominately supported by a single theme: Dr. Hartman's methodology and conclusions are different from those reached by Defendant's proffered experts. There is an acceptable range of differing methodologies and conclusions within which different expert witnesses may operate, and this case presents that range. *Kumho Tire Co.*, 526 U.S. at 153, 119 S.Ct. at 1177 (citation omitted).  Asserting that an opposing party's expert uses methods that do not conform with one's own expert's method does not demonstrate the unreliability of the opposing expert's methods.  *See id.*  The Supreme Court recognizes that experts may reasonably differ on issues of methodology and conclusions, but that those differences should be admitted assuming they each meet the reliability and relevance requirements to assist the trier of fact in

deciding often complex issues. *See id.*

One of the material calculations in this case has to do with "uplift," and the value for the "factor of safety" (*i.e.*, the ratio of the resisting forces to the driving forces, or uplift) differs between Dr. Hartman's and Dr. Thomson's testimony. Dr. Hartman utilized the Minnesota Department of Transportation manual in his analysis, Dr. Thomson used values contained in the Florida Department of Transportation manual, and the parties concede that the Alabama Department of Transportation manual does not contain the necessary standards for the issues at hand. While the parties argue over soil and ground compositions in Minnesota, Florida, and north Alabama, the geographic proximity of those two states to Alabama, skin friction between the drilled shaft and the rock socket, and the friction value between the seal concrete and the steel casing / cofferdam steel, the evidence of record taken as a whole, and especially the deposition testimony by Dr. Hartman and Dr. Thomson, convinces the court that, for purposes of a reliability and methodology determination, the Minnesota and Florida manuals' friction force values are appropriate, and that Dr. Hartman's and Dr. Thomson's overall analyses, including the factors of safety used by each individual, meet the baseline requirements of admissibility.

As discussed above, Defendant also challenges the methodology and reliability supporting Dr. Hartman's testimony regarding constructability and standard of

professional care, specifically with designs as to aspects of Pier 7.  Again, the record as a whole, which has been subjected to careful and close scrutiny, and Dr. Hartman's qualifications and areas of specialization are sufficient to satisfy the admissibility requirement of Rule 702 as to Dr. Hartman's testimony on these points.[7]  Defendant's assertions speak to the weight Dr. Hartman's testimony arguably should be given by the trier of fact, but are not persuasive that his testimony is inadmissible.

The opinions and findings of Dr. Hartman and Dr. Thomson are precisely the sort of testimony that should be weighed and decided by the trier of fact, in this case the trial judge at a bench trial, but does not cause the testimony to be inadmissible. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("[i]ssues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.").  After reviewing the parties' briefs

---

[7]    [The Eleventh Circuit has] held that "an expert may be qualified ... [but that] does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). When a witness relies "solely ... on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702) (internal quotation marks omitted).

*U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 810 (11th Cir. 2015).  To be clear, the court is not holding that Dr. Hartman or Dr. Thomson are reliable based solely on their qualifications, but based on the record as a whole.  Nevertheless, the expert's respective qualifications are strong support under the particular circumstances in this case that their methodology and conclusions are of the reliable sort required by Rule 702 and *Daubert*.

and the evidentiary submissions, Dr. Hartman and Dr. Thomson base their testimony on sufficiently reliable methods.  Inasmuch as the parties argue that they disagree with their opponent's expert's opinions, the parties are free at trial, within the boundaries established by the trial judge, to argue against any opinions reached by an opposing party's expert as well as present evidence of their own theories, which is in keeping with the notion that "[v]igorous cross-examination, presentation of contrary evidence and careful [attention] to the burden of proof are the traditional and appropriate means of attacking ... admissible evidence[,]" *Daubert*, 509 U.S. at 596, 116 S.Ct. at 2798, and "the weakness in the underpinnings of the expert's opinions go to its weight rather than its admissibility." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988).  The parties will have the opportunity to cross-examine Dr. Hartman and Dr. Thomson at trial to test their credibility and differing opinions before the trier of fact.

The testimony these expert witnesses offer is relevant to issues raised by Plaintiff's claims and Defendant's defenses, and they are likely to assist the trier of fact in reaching the ultimate issues.  The motions to exclude Dr. Hartman and Dr. Thomson are due to be denied.

### C.    Ben Nolan, III, P.E.

Defendant hired Mr. Nolan, a professional engineer who is also offered as a

Planning and Scheduling Professional, to "analyze the construction schedules and events forming the basis of the lawsuit to formulate opinions regarding the number, cause of, and responsibility for the delay days that occurred during Phase II of the bridge project." (Doc. 84 at p. 2).   He was also asked to formulate an opinion regarding the constructability of one of the revisions to Defendant's foundation design for Pier 7.  (*Id.*).  Mr. Nolan "has a Bachelor's of Science in Applied Sciences and Engineering from West Point that he obtained in 1979."  (Doc. 84 at p. 4).  "He subsequently obtained a Master's degree in Engineering Management from the University of Missouri in 1981." (*Id.*).  "He is a licensed professional engineer in Alabama, among other states, and specializes in civil engineering." (*Id.*).  During his professional career, he has worked as a project engineer for the U.S. Army Corp of Engineers, as a project manager, asa marine contractor and mechanical/utility contractor, and as the president of a general contracting company. (*Id.*).  Mr. Nolan has "worked in the construction industry for 34 years" and has experience in "marine construction work includ[ing] the use of cofferdams, although no work in over 10 feet of water."  (*Id.*).

Plaintiff contests the adequacy of Mr. Nolan's qualifications to testify as to the constructability of the revisions, arguing that Mr. Nolan (1) does not have the necessary experience or expertise in deep water projects, specifically that he has no

personal experience with the use of drilled shafts and cofferdams; and (2) when forming his conclusions, Nolan merely relied on the opinions of colleagues outside of his firm who had actual experience with the constructability of drilled shafts and cofferdams in deep water.

Plaintiff spends the bulk of the pages in its motion to exclude Nolan's testimony highlighting Nolan's lack of deep water construction experience, but Plaintiff misses a critical element: explaining why deep water experience is necessary to offer an opinion on constructability in this case. Plaintiff assumes the link is axiomatic; it is not. Defendant concedes that Nolan has no marine construction experience using cofferdams in greater than ten feet of water, but argues that his extensive experience in the construction industry, prior testimony in three cases involving shafts or cofferdams on land, and his education and training as a professional engineer qualify him to testify on constructability of the instant deep water bridge project. The court agrees that Defendant satisfies its burden to show that Mr. Nolan's experience and professional training qualify him to offer testimony on constructability in this case. Plaintiff is certainly free, within the confines set by the trial judge, to cross examine Mr. Nolan regarding his lack of deep water experience; however, that examination properly targets weight and credibility, not the admissibility of Nolan's testimony under Rule 702.

Insofar as Plaintiff argues that Mr. Nolan is not qualified because of his reliance on the opinions of his colleagues — *i.e.*, people who arguably have deep water experience — when formulating his opinions on constructability such that his reliance reduces Nolan to a mere conduit for information from other engineers, that argument is not convincingly supported by the record. Mr. Nolan's deposition testimony indicates that he took his colleagues' opinions into consideration when reaching his own conclusions as to this case, not that he parroted others' opinions as his own without any independent consideration on his part. The balance of the record weighs in favor of a finding that Mr. Nolan is qualified.

While not challenged by Plaintiff, the court has fulfilled its gatekeeper responsibility and undertaken a review of the record to satisfy itself of the reliability and relevance prongs of analysis. Mr. Nolan's testimony is, although a close call primarily because of his reliance on the advice of engineering colleagues who have not been disclosed and are not expert witnesses in this action,[8] sufficiently reliable, relevant, and likely to assist the trier of fact in this matter. Any "shaky" areas in Mr.

---

[8] Plaintiff makes a passing hearsay objection in the motion to exclude Mr. Nolan's testimony. That objection is not addressed by this order and is left to the trial judge should Plaintiff reassert a hearsay objection. No opinion is expressed or implied herein on such a hearsay objection except to note that the objection does not impact the resolution of the motion to exclude Mr. Nolan as an expert witness. In other words, Plaintiff is not being granted license to revisit the court's ruling on the *Daubert* motion by way of a hearsay objection at trial, but is not prohibited by this order from asserting a stand-alone hearsay objections as a challenge to Mr. Nolan's testimony that is separate from a Rule 702 challenge.

Nolan's testimony or questions regarding the foundations of his testimony, as those questions relate to weight and credibility, can be explored at trial through the "vigorous" cross-examination countenanced by the Supreme Court. *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798.  The motion to exclude Mr. Nolan's expert testimony is due to be denied.

## III.   CONCLUSION AND ORDER

Accordingly and for the reasons discussed herein, it is **ORDERED** as follows: Defendant's motion to strike, exclude or limit the testimony of Dr. Richard Hartman (Doc. 65), Defendant's motion to strike, exclude or limit the testimony of Dane Floyd (Doc. 66), Plaintiff's motion to strike or exclude the testimony of Ben D. Nolan, III (Doc. 70), and Plaintiff's motion to strike or exclude the testimony of Dr. Ted Thomson (Doc. 71) are **DENIED**.  *See* Fed. R. Civ. P. 72, 28 U.S.C. § 636, Order of Reference (Doc. 76; Entered Feb. 23, 2015).  All other pending motions will be addressed in separate orders or recommendations, as appropriate.

**DONE** and **ORDERED** this 14th day of October, 2015.

/s/ Paul W. Greene
United States Magistrate Judge

23